**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

```
KIMBERLY WETHERELL et als       *
                                *
     Plaintiffs                 *
                                *
v.                              *      Civil No. 06-2079 (SEC)
                                *
HOSPITAL INTERAMERICANO DE      *
MEDICINA AVANZADA, INC. et als  *
                                *
     Defendants                 *
*********************************
```

**OPINION and ORDER**

Pending before this Court is Defendants Alfonso Serrano Isern ("Serrano"), his wife, and their conjugal partnership's (collectively "Co-Defendants") Motion for Summary Judgment (Dockets ## 46-48), and Plaintiffs Kimberly Wetherell ("Wetherell"), Artemio Borges, and Stephanie Marie-Borges Wetherell's ("Stephanie") (collectively "Plaintiffs") opposition thereto (Docket # 63). After reviewing the filings, and the applicable law, Co-Defendants' Motion for Summary Judgment is **GRANTED**.

**Factual and Procedural Background**

On October 26, 2006, Plaintiffs brought this suit under diversity jurisdiction against Hospital Interamericano de Medicina Avanzada, Inc., Centro Medico del Turabo, Inc. d/b/a HIMA Caguas ("HIMA"), Conjunta de Seguros de Responsabilidad Profesional Medico-Hospitalaria ("SIMED"), Co-Defendants, and other unnamed defendants, alleging medical malpractice, and seeking redress under Articles 1802 & 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 & 5142. According to the complaint, Wetherell was admitted to HIMA on June 2, 3003 at approximately 7:33 am, for induction of labor. Serrano ordered a cesarean section (C-section) due to "fetal bradycardia and decreased variability", and an umbilical cord prolapse. Docket # 14, pp. 3 & 4. At 8:15 am, Wetherell signed the consent form for said procedure, she was taken to the operating room at 10:00 am, and anesthesia was begun at 10:18 am. Stephanie was delivered at 10:22 am, via C-section performed by Serrano. Stephanie weighed 7 pounds 5 ounces, with an Apgar score of 8/9, and with the umbilical cord wrapped around her neck. Stephanie remained hospitalized until

June 11, 2003.

Plaintiffs allege that Stephanie sustained injuries during the birth, attributable to intrapartum anoxia secondary to an umbilical cord prolapse, and the delay in performing the C-section. As result, she suffers from physical and neurological defects, global developmental delay, low muscle tone, and will require prolonged medical care, physical, occupational and speech therapy. Plaintiffs allege that Serrano failed to provide adequate medical standards insofar as he delayed performing the C-section, which in turn led to an improper diagnosis of the intrapartum anoxia secondary cord prolapse. According to Plaintiffs, Serrano's negligent acts caused Stephanie's current and future medical problems, and as a result, they seek that all defendants be held jointly and severally liable for damages in an amount no less than $5,000,000, interest, and litigation costs.

On March 12, 2008, Co-Defendants filed their motion for summary judgment. Dockets ## 46-48. Therein, they allege that Serrano provided treatment according to the applicable medical standard, and in compliance with a physicians' duty of reasonable care. Co-Defendants further contend that Plaintiffs have failed to "demonstrate the relationship between Dr. Serrano's delivery of the baby girl Stephanie [sic] and how the alleged deviation from the medical standard of care made by Dr. Serrano caused the damages alleged in the complaint." Docket # 48, p. 41. Absent said causal relationship, Co-Defendants argue that Plaintiffs have not satisfied the burden of proof required for a medical malpractice claim under Article 1802 of the Puerto Rico Civil Code.

In their opposition, Plaintiffs aver that, contrary to Co-Defendants allegations, the facts in this case show that Serrano is responsible for Stephanie's damages, and as such, Co-Defendants' request for summary judgment should be denied. Docket # 63.

**Standard of Review**

*R. FED. CIV. P. 56*

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); see also Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue...Failure to do so allows the summary judgment engine to operate at full throttle." Id.;

**Civil No. 06-2079 (SEC)**          4

see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.")

### Applicable Law and Analysis

Because the instant motion is for summary judgment, Co-Defendants must comply with the requirements of Local Rule 56, and file a statement of facts, set forth in numbered paragraphs, and supported by record citations. See Local Rule 56(b). In turn, when confronted with a motion for summary judgment, the opposing party must:

> [s]ubmit with its opposition a separate, short, and concise statement of material facts. The opposition shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation...Local Rule 56(c).

Local Rule 56(e) further provides that "[a]n assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion." Moreover, a "court may disregard any statement of material fact not supported by a specific record citation to record material properly considered on summary judgment." Local Rule 56(e). These rules "are meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court." Cabán-Hernández v. Phillip Morris USA, Inc., 486 F.3d 1, 8(1st Cir. 2007). The First Circuit has held that when the parties ignore the Local Rule, they do so at their peril. See Ruiz-Rivera v. Riley, 209 F. 3d 24, 28 (1st Cir. 2000).

Upon reviewing the parties' filings, this Court finds that Co-Defendants failed to provide specific record citations in support of ¶¶ 1-14, 23, 29, and 30-32 of their Statement of Uncontested Material Facts ("SUF"). Specifically, they did not specify the page or

**Civil No. 06-2079 (SEC)** 5

paragraph in support of each assertion of fact, despite submitting exhibits which range from 4 to 70 pages. Pursuant to Local Rule 56(e), this Court may disregard any statement of fact that is not supported by a specific record citation. As such, statements ¶¶ 9, 23, 30, and 32 will not be considered by this Court. However, considering that Plaintiff admitted ¶¶1-4, 6, 8, 10, 11, 12[1], 21, 26, 27 and 28, this Court will deem said facts as uncontested.

Moreover, although Plaintiffs denied or admitted each of Co-Defendants' assertions of fact, they failed to provide specific record citations, that is, the page or paragraph number of each document provided in support of their denials. As a result, statements ¶¶ 16-20, 22, and 24[2] of Co-Defendants' SUF, insofar as they are properly supported by specific record citations, are deemed uncontested. Despite the above procedural hurdles, this Court must entertain the motion on the merits, and may not grant the same as a sanction even for failure to comply with the Local Rules. See De la Vega v. San Juan Star, 377 F. 3d 111, 116 (1st Cir. 2004).

Considering the above, this Court will first examine the uncontested facts, which are as follow. Stephanie is Artemio Borges and Wetherell's daughter. Co-Defendants' SUF ¶ 1. Serrano is a medical doctor, specializing in obstetrics and gynecology. Id. at 2. Wetherell was Serrano's patient from February 6, 2003 through June 5, 2003. Id. Her pregnancy was normal, and her prenatal care was uneventful. Id. at 4. Serrano, as the physician in charge of Wetherell and Stephanie during the pregnancy, together with the hospital's nurses and staff, attended the delivery. Id. at 6. While performing the C-section, Serrano discovered an occult cord prolapse; a condition different from a "cord prolapse." Id. at 8. According to the record's notes, Stephanie's appeared to be a normal baby. Id. at 10. She cried and suckled

---

[1] Both parties agree that Stephanie was discharged on June 11, 2003. However, they disagree as to her condition on the day of her discharge. As such, this Court will consider this statement as partially admitted.

[2] Although Co-Defendants provide a specific record citation in support of ¶ 15, they also fail to provide the page or paragraph number of Exhibit IV. Upon reviewing the pages cited in Exhibit V, this Court finds that it does not support Co-Defendants statement.

**Civil No. 06-2079 (SEC)**                                                                                      6

normally, and the head sonogram, the neurological, and pulmonary evaluations did not reveal any abnormalities. Id. Wetherell was discharged from the hospital on June 5, 2003, while Stephanie was discharged from the hospital on June 11, 2003 . Id. at 11 & 12.

According to her therapist, Stephanie has made considerable improvement since she began physical and speech therapy. Id. at 16. Dr. Steven Weissberg, Plaintiff's expert witness', assessment of what was the proper treatment to be followed by Serrano was not based on any specific or known medical literature, but rather on his own experience. Id. at 17. During his deposition, Dr. Weissberg admits that the records he used to prepare his report were illegible, and in a language that he does not know because he does not understand Spanish. Id. at 18. Nevertheless, he rendered his report without asking for a translation or a transcript of the records. Id. In his written report, Dr. Weissberg states that there was a cord prolapse, and that this made it "a true obstetrical emergency," but in his deposition he admits that there was not a cord prolapse, but an occult cord prolapse, which is not the same, since an occult cord prolapse, by definition, is not a visible condition. Id. at 19.  Therefore, Dr. Weissberg admits that neither Dr. Serrano or any other doctor could have known about the occult cord prolapse in deciding to do a C-section, and even less an emergency cesarean. Id.

Dr. Weissberg also admits in his deposition that a heart rate of 110 is not bradycardia, instead bradycardia is anything below 110, and that the times that the heart rate went below 110 were brief, and they were not sustained. Id. at 20. He also concedes that his assertions about Serrano's state of mind, specifically that Serrano must have been concerned for the baby's health when he ordered an emergency C-section, were based on his own assumptions and interpretations of what occurred, and not based on the medical record nor any other evidence. Id. Dr. Weissberg further admits in his deposition that Stephanie's medical records reflect that a normal baby was born, that there were no complications, and that the alleged problems since birth mentioned in his report are exclusively based on what he was told, instead of Stephanie's medical records or examinations. Id. at 21. Furthermore, Dr. Weissberg states there was a delay in doing the C-section, however, in his deposition he

**Civil No. 06-2079 (SEC)** 7

admits that he does not know if it was a reasonable delay. Id. at 22. He further admits that the records he used to prepare his report were incomplete, and that he did not examine any neurological examinations or neurological records. Id. at 24.

Dr. Allan Hausknecht, Plaintiffs' other expert witness, admits that he did not examine any neurological examinations which demonstrate that Stephanie has any brain damage. Id. at 25. He also states that has not seen the reports rendered by Stephanie's therapists and teachers about Stephanie's current condition. Id. at 26. Moreover, he hasn't seen any radiological tests done on the baby, and admitted that the baby was stable after birth, and there were no neurological findings. Id. at 27. Dr. Hausknecht admitted that, out of all the physicians that have examined Stephanie, only Dr. Pollack, a geneticist, stated in her report that the minor has global developmental delay. Id. at 28. However, he notes that Dr. Pollack also states that there is no specific etiology for said condition, that is, that Dr. Pollack is not sure what caused the delay. Id.

In determining whether to grant Co-Defendants' request for summary judgment based on the foregoing facts, this Court must address the applicable standard in medical malpractice suits. In a diversity suit, Puerto Rico law is controlling. See Santiago v. Hosp. Cayetano Coll y Toste, 260 F. Supp. 2d 373, 380 (1st Cir. 2003); Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005). Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, governs a physician's liability in a medical malpractice suit. See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997). Said article provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141.

Under this statute, "three elements comprise a prima facie case of medical malpractice." Santiago, 260 F. Supp. 2d at 380 (citing Cortes-Irizarry, 111 F.3d at 189). Therefore, in order to prevail in a medical malpractice claim, a plaintiff must establish three elements: "(1) the basic norms of knowledge and medical care applicable to general

practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation between the act or the omission of the physician and the injury by the patient." Santiago, 260 F. Supp. 2d at 381: see also Sierra-Perez v. United States, 779 F. Supp. at 643; Medina Santiago v. Dr. Alan Velez, 120 P.R. Dec. 380 (1988); Pagan Rivera v. Municipio de Vega Alta, 127 P.R. Dec. 538 (1990); Marcano Rivera, 415 F.3d at 167; Cortes-Irizarry, 111 F.3d at 189. The First Circuit has held that "[i]n the medical malpractice context, an action for damages lies when, by preponderance of evidence, it is proved that the doctor's negligent conduct was the factor that most probably caused the plaintiff's damage." Santiago, 260 F. Supp. 2d at 381 (citing Sierra-Perez, 779 F. Supp. at 643); see also Perez-Cruz v. Hosp. La Concepcion, 115 P.R. Dec. 721, 732 (1984). The "burden of a medical malpractice plaintiff in establishing the physician's duty is more complicated than that of an ordinary tort plaintiff. Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994).

In explaining the duty of care owed to patients, Puerto Rico courts have described it as that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession. Santiago, 260 F. Supp. 2d at 380 (citing Irizarry v. Corporacion Insular de Seguros, 928 F. Supp. 141, 144 (D.P.R. 1996)); see also Oliveros v. Abreu, 101 P.R. Dec. 209, 226 (1973); Marcano Rivera, 415 F.3d at 167-168. This is a nationally recognized and applicable standard. Santiago, 260 F. Supp. 2d at 380 (internal citations omitted). Accordingly, physicians are "expected to possess, and use, that level of knowledge and skill prevalent in his or her specialty generally, not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered." Santiago, 260 F. Supp. 2d at 381 (citing Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993). Moreover, "a health care provider has 'a duty to use the same degree of expertise

**Civil No. 06-2079 (SEC)**                                                                                           9

as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in professional acumen or level of care.'" Cortes-Irizarry, 111 F.3d at 190; Rolon-Alvarado, 1 F.3d at 77-78.

The courts do not hold a doctor to a "standard of perfection nor makes him an insurer of his patient's well-being." Irizarry, 928 F. Supp. at 145. An "error of judgment regarding diagnosis or treatment does not lead to liability when expert opinion suggests that the physician's conduct fell within a range of acceptable alternatives." Lama, 16 F.3d at 478. As such, only when a physician "has failed to comply with the basic norms comprised in the national standard of care may he be held liable for medical malpractice." Santiago, 260 F. Supp. 2d at 381 (citing Torres-Nieves v. Hospital Metropolitano, 998 F. Supp. 127, 137 (D.P.R. 1998.)) Therefore, under Puerto Rico law, it is presumed that a treating physicians has observed a reasonable degree of care while giving medical attention and treatment. Santiago, 260 F. Supp. 2d at 381. As a result, the plaintiff "bears the burden of refuting this presumption." Id. (citing Rolon-Alvarado, 1 F.3d at 77-78). Since medical knowledge and training are critical to demonstrate the parameters of a health-care provider's responsibilities, the minimum standard of acceptable care is almost a matter of informed opinion. Santiago, 260 F. Supp. 2d at 381 (citing Rolon-Alvarado, 1 F.3d at 78.) Therefore, when claiming a established breach of a physician's duty of care, the plaintiff must adduce expert testimony to show the minimum acceptable standard, and confirm that the defendant doctor failed to provide it. Santiago, 260 F. Supp. 2d at 382 (citing Cortes-Irizarry, 111 F.3d at 190.) Moreover, causation cannot be found based on mere speculation and conjecture, thus, expert testimony is also generally essential in order to clarify complex medical issues that are more prevalent in medical malpractice cases than in standard negligence cases. See Marcano Rivera, 415 F.3d at 168. Causation "is also more difficult in a medical malpractice case than in a routine tort case because a jury must often grapple with scientific processes that are unfamiliar and involve inherent uncertainty." Lama, 16 F.3d at 478.

Upon reviewing the parties' filings, this Court finds that Plaintiffs have properly controverted ¶¶ 5, 7, 13, 14, 25, 29, and 31 of Co-Defendants' SUF. However, Plaintiffs have failed to show that material issues of fact remain as to the elements of their cause of action. This Court notes that Serrano provides Plaintiffs' expert witnesses' own testimonies in order to show that he provided the appropriate standard of care, pursuant to the current practice and standard of medicine, and that there is no causal relationship between the alleged negligent acts, and Stephanie's current condition. Specifically, Plaintiffs did not adequately rebut the presumption that Serrano observed a reasonable degree of care while providing treatmlorient. Based on the foregoing uncontested facts, while performing the C-section, Serrano discovered an occult cord prolapse, a condition that is not visible, and is clearly different from a "cord prolapse." Plaintiffs' own expert, Dr. Weissberg admits that neither Serrano, or any other doctor, could have known about the occult cord prolapse prior to the surgery, therefore, Serrano had no reason to order an emergency C-section. Dr. Weissberg also admitted that a heart rate of 110 is not bradycardia, and although Stephanie's heart rate dipped below 110, said occurrences were brief, and were not constant. Furthermore, Stephanie appeared to be a normal baby, she cried and suckled normally, and the head sonogram, the neurological, and pulmonary evaluations did not reveal any abnormalities. The medical records show that there were no complications during birth, and that Stephanie was stable. As a matter of fact, Wetherell was discharged from the hospital on June 5, 2003, while Stephanie was discharged form the hospital on June 11, 2003.

Plaintiffs also failed to demonstrate that Stephanie's damages are causally related to Serrano's actions. Although in his report Dr. Weissberg concludes that there was a delay in perfoming the C-section, in his deposition he admits that he doesn't know if the alleged delay was reasonable. Furthermore, Plaintiffs' own experts cannot attest to the cause of Stephanie's present medical conditions, and their severity. Although Plaintiffs contend that she has global developmental delays, and low muscle tone as a result of the anoxia she suffered during birth, they have not provided evidence which supports such finding. On the contrary, Plaintiffs'

**Civil No. 06-2079 (SEC)**                                                                 **11**

own experts admit that they have not examined Stephanie, or any radiological or neurological tests which show that she suffers from said conditions. As such, Plaintiffs have failed to show that Serrano's actions are a departure from the reasonable standard of due care, and that Serrano's actions caused Stephanie's alleged injuries.

**Conclusion**

Based on the foregoing, Co-Defendants' motion for summary judgment is **GRANTED**.

**SO ORDERED**.

In San Juan, Puerto Rico, this 31st day of March, 2009.

*S/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge